*Counsel listed on last page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| In re EXPRESS MOBILE CASES | Case Nos.  3:19-cv-06559-RS |
| | 3:20-cv-06152-RS |
| | 3:20-cv-08297-RS |
| | 3:20-cv-08321-RS |
| | 3:20-cv-08335-RS |
| | 3:20-cv-08339-RS |
| | 3:20-cv-08461-RS |
| | 3:20-cv-08491-RS |
| | 3:20-cv-08492-RS |
| | 3:21-cv-01145-RS |
| | 3:21-cv-02001-RS |
| | **DEFENDANTS' CLAIM CONSTRUCTION BRIEF** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................. 1

III.    TERMS FOR CONSTRUCTION .......................................................................... 3

        A.      Application/application ('755 patent, '287 patent, '044 patent) ................................. 3

                1.      The Application is "separate from" the Player ................................. 4

                2.      The Application is interpreted or executed by the Player. ............................... 6

        B.      Player/player ('755 patent, '287 patent, '044 patent) ................................. 8

                1.      The Player is "device-specific code." ................................. 9

                2.      The Player is "executable code." ................................. 12

        C.      device-dependent code / device dependent code ('755 patent, '287 patent).............. 15

        D.      device-independent code / device independent code ('755 patent, '287 patent).............................................................................................. 18

        E.      web component ('755 patent, '287 patent, '044 patent) ................................. 18

        F.      Each symbolic name has an associated data format class type corresponding to a subclass of User Interface (UI) objects that support the data format of the symbolic name ('287 patent, '044 patent) ................................. 21

        G.      preferred UI object ('287 patent, '044 patent) ................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
  713 F.3d 1090 (Fed. Cir. 2013) ..................................................................... 4

*Durel Corp. v. Osram Sylvania Inc.*,
  256 F.3d 1298 (Fed. Cir. 2001) ................................................................. 7, 13

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
  93 F.3d 1572 (Fed. Cir. 1996) ..................................................................... 22

*Fenner Inv., Ltd. v. Cellco P'ship*,
  778 F.3d 1320 (Fed. Cir. 2015) .................................................................... 14

*Free Stream Media Corp. v. Alphonso Inc.*,
  996 F.3d 1355 (Fed. Cir. 2021) ................................................................. 7, 13

*iLOR, LLC v. Google, Inc.*,
  550 F.3d 1067 (Fed. Cir. 2008) .......................................................... 7, 13, 14

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ..................................................................................... 22

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
  952 F.3d 1336 (Fed. Cir. 2020) ........................................................... 4, 6, 11

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .................................................................. 7, 14

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999) .................................................................... 16

*Purdue Pharma L.P. v. Endo Pharm. Inc.*,
  438 F.3d 1123 (Fed. Cir. 2006) .................................................................... 10

*Shire Dev., LLC v. Watson Pharms., Inc.*,
  787 F.3d 1359 (Fed. Cir. 2015*)* ..................................................................... 6

*Shopify Inc. v. Express Mobile, Inc.*,
  No. CV 19-439-RGA, 2020 WL 3432531 (D. Del. June 23, 2020) .............. *passim*

*Tempo Lighting, Inc. v. Tivoli, LLC*,
  742 F.3d 973 (Fed. Cir. 2014) ........................................................................ 7

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  789 F.3d 1335 (Fed. Cir. 2015) .................................................................... 12

1   **I.   INTRODUCTION**

2       Express Mobile's vague constructions broaden the claims beyond the scope supported by the

3   disclosures of the '755, '287, and '044 patents.  By contrast, Defendants' constructions are supported

4   by the intrinsic record and how a person of ordinary skill in the art would have understood the disputed

5   terms.  This Court should adopt Defendants' proposed constructions.

6   **II.   BACKGROUND**

7       The purported invention claimed in the '755 patent family[1] "generally relates to providing

8   software for mobile devices."  ('755 patent at 1:7-8.)  The applicants' stated goal was to overcome

9   "time consuming and expensive" practicalities of programming for a myriad of different mobile

10  devices  with every desired update.  ('755 patent at 1:23-26.)  The suggested improvement rests on

11  three principal, interacting software components: Applications, Players, and an authoring tool, which

12  are claimed in various combinations in the asserted claims.

13      As the patent describes, Applications provide the desired updated experiences to end users.

14  But, instead of needing to be coded for specific devices, Applications comprise device-***in***dependent

15  code that can be distributed in the same form to all devices, avoiding the need for programming each

16  update differently for each of a myriad of devices.  That device-independent code in the Application,

17  however, still needs to be interpreted so that specific devices can process it. Players fill that role,

18  interpreting or executing the Applications, and differ from Applications in that they comprise device-

19  dependent code that each device is already able to process fully.  Finally, the authoring tool lies at the

20  conceptual core of the described system.  As the patent describes, a user of the authoring tool "can

21  produce an Application and Player that produces the same display and desired programming on [the]

22  device." ('755 patent at 8:27-31.)

23      The '755 patent illustrates this relationship between end user devices, authoring tool,

24  Application, and Player in a number of its drawings.  For example, Figures 1A and B show how the

25  myriad of users can be serviced by a system built around an authoring platform.  And, Figure 2A

26

27  ---

[1] The '755 patent, '287 patent, and '044 patent share a common specification.  Citations and
28  references herein are to the '755 patent specification, but apply equally to the asserted claims in
the '287 patent and '044 patent, unless otherwise noted.

1  provides further granularity, illustrating how the authoring platform separately provides Players and

2  Applications to devices.  Figure 13 goes a step further in illustrating device specific characteristics

3  that determine which Player is sent to which device.

4       The user of the authoring tool further can choose components from various web services she

5  wishes to incorporate into her Application and choose the user interface (UI) object that will be used

6  to receive inputs from or display outputs to an end-user related to the chosen component.  (*See* '755

7  patent at 8:18-53.)  Web services are software systems designed to support interoperable machine-to-

8  machine interactions over a network.  (*See* '755 patent at 1:33-36, 8:18-19.)  For example, if the user

9  wants to display an RSS feed, the user would select the desired RSS feed from a registry of available

10  feeds.[2]  The user would select the RSS feed she wants from the registry of feeds available.  The user

11  would then associate the outputs of that web service (e.g., the "item-description" shown at

12  XMO_00002266) to a desired UI object that is useful to display that datatype.[3]

13       The '755 patent applicants urged that this overall arrangement of authoring tool, Applications,

14  Players, and web components allowed ready adaption to new devices coming on the market or web

15  services offering new capabilities.  In the former instance, the envisioned system creates and

16  distributes a new Player for the new devices; in the latter, the system distributes a new Application

17  that can use the new web services.  Indeed, the applicants summarized their understanding that these

18  advantages supported patentability during prosecution as follows:

19      In one aspect of the present invention, the device-independent Application and device-
20      dependent Player are both provided to a device, such as a smartphone.  Both codes are
        executed or interpreted on the same device, which communicates with a web service.
21      By partitioning code for accessing web services into an Application and a Player has
        an advantage for maintaining websites.  Thus, for example, code that is device specific
22      may be maintained separately from code that is web service specific.  If a new device
        comes on the market, or if it is found that the device-dependent code for a specific
23      device needs an update, a new Player is developed and provided to those specific
        devices.  Likewise, if new capabilities are provided for certain web services, or if a
24      new web service is available, then a new Application is developed for those web
        services, and provided to devices requesting those services.

25

26  _____

27  [2] *See* '755 patent at 9:17-26.  "RSS" stands for Real Simple Syndication and an RSS feed provides
    subscribers to the feed with updates to the associated website in a standardized format.  (*See* Exh. 1
28  at XMO_00002266 (showing a "USA Today Top Stories" RSS feed in the web component registry).)
    [3] *See* '755 patent at 9:17-26.

As one example of the operation of the Application and Player on a device, the device receives an executable code in the form of a Player. The device also receives an Application that is a device-independent code containing web service information. The execution of the Player on the device causes the Application to be interpreted and the following actions to occur on or in communication with the device: a display requesting web service input is provided, a web service request is generated and provided to the web service, the resulting web service output is received, and a display representative of the output is generated.[4]

The specification of the '755 patent consistently touts as an alleged advantage of the Player/Application dichotomy the fact that "all of the device-dependent programming is provided to the device only once (or possibly for some small number of upgrades), permitting a smaller Application, which is the same for each device."[5]

## III.   TERMS FOR CONSTRUCTION

### A.   Application/application ('755 patent, '287 patent, '044 patent)

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Device-independent software code containing instructions for a device | Device-independent code that is separate from the Player/player and is interpreted or executed by the Player/player |

As the file history and specification of the '755 patent confirm, the purported invention is based on two different sets of code. The first, called an Application, is designed such that it can be understood by all devices, regardless of any differences in hardware or operating system. The second set of code is called a Player, and it is specific to particular types of computers and functions to make the device-independent Application run on a specific device. The parties agree that "Application" or "application" (hereinafter, "Application") is device-independent code,[6] but dispute: (1) whether the Application and the "Player" or "player" (hereinafter, "Player") are separate; and (2) whether the Application is interpreted or executed by the Player.

---

[4] Exh. 8 at XMO_00002998.
[5] '755 patent at 5:51-55.
[6] Substantively, Defendants do not dispute that the "code" is software and contains instructions for a device, as set forth in Express Mobile's proposed construction, but this additional language is unnecessary and redundant, given that "code" in this context is software that contains instructions for a device.

### 1.   The Application is "separate from" the Player

Application and Player are separate and distinct elements in the claims, as Express Mobile acknowledges.  (Opening Br. at 6 ('755 and '287 claims "separately recite 'an Application . . . and a 'Player…'"); *id*. ('044 claims "convey separation between the functions of the application and player code").)  The prosecution history further confirms and clarifies that the Application is separate from the Player.  Indeed, the applicants explicitly distinguished the claimed invention from the *McCain* prior art on this basis:

- There "is no teaching or suggestion in [the prior art] McCain of an authoring tool that provides **two separate codes**: a device-dependent code (such as the claimed Player) and device-independent code (such as the claimed Application)."[7]   (Exh. 4[8] at XMO_00002803.)

- "The solution of *McCain* **is one code** that is delivered to the device . . . There is no teaching or suggestion in *McCain* of **separating** binary, non-binary, or executable components into **different codes**."  (*Id*. at XMO_00002802-2803.)

The applicants' clear and unambiguous distinction of the claimed invention from the prior art on this basis gives rise to prosecution history disclaimer because the applicants narrowed the scope of the claimed invention to "separate codes" to overcome the prior art.  *See, e.g.*, *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (finding disclaimer applies).  Express Mobile now argues that the applicants distinguished *McCain* only based on it lacking a player and application, as opposed to *separate* player and application codes.  But the quoted excerpt shows that the applicants expressly argued that: "[t]here is no teaching or suggestion in *McCain*" that "provides two separate codes" or "separating" codes.  (Exh. 4 at XMO_00002802-2803.)

Even if this evidence did not rise to the level of disclaimer, the applicants' repeated and consistent statements about the separateness of the Application and Player support Defendants' proposed construction.  *See, e.g.*, *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1345-46 (Fed. Cir. 2020) ("the Board erred by effectively requiring the prosecution history evidence to rise to the level of a disclaimer in order to inform the meaning of the disputed claim term").  For example, in addition to the arguments referenced above, the applicants also explained to the Patent

---

[7] All emphasis is added herein, unless otherwise indicated.
[8] Exhibits cited herein are attached to the Declaration of J. David Hadden filed concurrently herewith.

Office that:

- "**[P]artitioning** code for accessing web services into an Application and a Player has an advantage for maintaining websites. Thus, for example, code that is device specific may be maintained **separately** from code that [sic] web service specific." (Exh. 8 at XMO_00002998.)

- "[T]he claimed invention, in contrast, operates by **partitioning** the code required for functionality into device-independent code and device-dependent code. The inventors have found that this greatly simplifies providing software to a variety of devices." (Exh. 7 at XMO_00002938.)

Based on this intrinsic record, all three district courts that have previously addressed the Application term construed the Application to be "separate from" the Player. (Exh. 15 at DEFSEXTRINSIC_XMO_00000392-393; Exh. 16 at DEFSEXTRINSIC_XMO_000000047; Exh. 17 at DEFSEXTRINSIC_XMO_00000563-64.)[9]

Express Mobile's opening brief undermines its position. Express Mobile argues that the "separate from" requirement is superfluous, yet Express Mobile acknowledges the distinction is correct, because the claims "separately recite" an Application and a Player having a "separation" of functions. Defendants' proposed construction clarifies and confirms the separation required between the Application and Player, whereas Express Mobile's proposed construction ignores it. Similarly, Express Mobile seeks to avoid three prior claim construction orders from different district courts by referencing an embodiment in which the Application and Player are allegedly integrated. Opening Br. at 5. But the *Shopify* court considered this very embodiment and concluded that it did *not* show an integrated, single Player/Application as Express Mobile contends. Exh. 25 at 7-8. This portion of the specification in fact describes an "abstraction interface" that "separates" the server-side facilities that relate to the Application from the Player, where the "abstraction interface" provides a means for the two separate codes to interact. ('755 patent at 7:30-37; Declaration of Christopher Schmandt ("Schmandt Decl.") ¶¶ 37-39.) The reference to "extend the Application on the Player" concerns the interpretation or execution of the Application by the Player to facilitate a "client/server" interaction. (*Id.*)

---

[9] Express Mobile acknowledged in a different litigation that the prosecution statements "reflected the fact that the application and player were separate." (Exh. 27 at 72:5-7.) Its expert agreed in deposition. (Exh. 19 at 175:24-176:16.)

## 2.    The Application is interpreted or executed by the Player.

Consistent with the fact that a "Player" must play something, the specification discloses that the claimed Player interprets or executes the instructions in the Application:

- "The device's Player **interprets or executes** the Application to generate one or more 'pages' . . . The Player may include code that is device-specific—that i[s], each device is provided with a Player that is used in the interpretation and execution of Applications." ('755 patent at 6:6–11.)

- "The Player then **interprets** the Application Page extracted from PDL which in turn defines all of the virtual machine compliant Objects . . ." (*Id*. at 11:44–51.)

- "The intended programming is carried out on device 130 when the device, **having the appropriate device platform Player**, receives and **executes** the device-independent Application." (*Id*. at 13:46–49.)

(*See also id.* at 2:1-3 ("Application that is a device independent code that [is] **interpreted** by the Player").)  This makes sense because the parties agree that the Application is device-independent code for a web page.  Something must execute or interpret the Application on specific devices for it to run.  And that something is the Player.  (Exh. 8 at XMO_00002998.; Exh. 7 at XMO_00002934; Schmandt Decl. ¶ 45.)

During prosecution, the applicants also repeatedly characterized the "Application" as being interpreted or executed by the Player.  For example, to overcome the *McCain* prior art, the applicants argued that "the Player interprets the Application and dynamically provides information . . . on the display of the device." (Exh. 4 at XMO_00002802.)  In response to an additional office action, the applicants argued that "[t]he ***present application*** teaches . . . the Player (being device-dependent) is executed to interpret non-binary, device independent [code] contained in the Application" to overcome an obviousness rejection over the McCain, Benedetti, and Paddon references.  (Exh. 7 at XMO_00002934.)  These statements help define the claimed "Application" in distinguishing the alleged invention from the cited prior art.  *See, e.g.*, *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1345 (Fed. Cir. 2020) ("repeated and consistent statements during prosecution" determined claim scope, "even if those statements do not rise to the level of a disclaimer"); *Shire Dev., LLC v. Watson Pharms., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015) ("Although the prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim

construction."); *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) ("[T]he prosecution history … serves as intrinsic evidence for purposes of claim construction.").

In contrast, the intrinsic record does not describe any embodiments where the Application is not interpreted or executed by the Player.  *See, e.g.*, *iLOR, LLC v. Google, Inc.*, 550 F.3d 1067, 1073–74 (Fed. Cir. 2008) (affirming construction of "toolbar being displayable" as "the toolbar is 'automatically displayed'" because specification did not disclose embodiments with user action to display toolbar); *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1367 (Fed. Cir. 2021) (construing "communication session" to be bidirectional because "all references to the *claimed* communication session . . . describe this session as bidirectional."); *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1304 (Fed. Cir. 2001) (construing "oxide coating" to require "binary compounds containing only metal cations and oxygen" because "all of [the examples in the specification] are binary compounds containing only metal cations and oxygen").

Express Mobile's cited intrinsic evidence is not to the contrary.  For example, Express Mobile relies on a portion of the specification that teaches: "[t]he intended programming is carried out **on** device 130 when the device, **having** the appropriate device platform **Player**, receives and **executes** the device-independent Application."  ('755 patent at 13:46–49.)  It is only the device with the "appropriate" Player that can receive and execute the Application because, as the specification and file history repeatedly explain, it is the Player that executes or interprets the Application.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (a POSITA "is deemed to read the claim terms . . . in the context of the entire patent").  (*See, e.g.*, '755 patent at 6:6–11 ("Player interprets or executes the Application"); 11:44–51 ("Player then interprets the Application"); 2:1-3 ("Application . . . interpreted by the Player"); 13:46–49 ("Player, receives and executes the device-independent Application"); Exh. 4 at XMO_00002802 ("the Player interprets the Application"); Exh. 7 at XMO_00002934 ("Player (being device-dependent) is executed to interpret . . . the Application").)[10]

---

[10] The court in *Shopify* considered only two statements in the intrinsic record, and found "both these statements, however, appear to be describing embodiments."  (Exh. 25 at 8.)  In the instant case, Defendants present a more extensive record of evidence, as set forth above.  Respectfully, Defendants disagree with the *Shopify* court's conclusion, particularly where nothing in the intrinsic record suggests an alternative embodiment and nowhere does the specification explain how the device-independent Application is interpreted or executed without the Player, which 'plays' it.

This is further reflected in the claims, which require the Application to be "executed **on** the device," not "by" the device.  Indeed, Express Mobile fails to identify what specifically "on" the device performs the execution or interpretation, and merely takes a vague, generalized position that the "device itself" does it.  But the intrinsic record repeatedly identifies, without contrary disclosures, that the Player "on" the device interprets or executes the Application.  Neither Express Mobile nor the intrinsic record identifies anything "on the device" other than the claimed Player that performs the necessary interpretation or execution of the device-independent code.  (Schmandt Decl. ¶¶ 50-51.)  The claims provide for an Application that is device-independent code that must be interpreted or executed for the device to use for display.  ('755 patent at 37:29-46; '287 patent at 38:15-25; '044 patent at 38:26-27; Schmandt Decl. ¶ 77.)  The purpose of the claimed Player, and the two-code structure of the alleged invention, is to provide a Player having device-specific code that can interpret or execute the device-independent Application for a device's display.  (Exh. 8 at XMO_00003002; Schmandt Decl. ¶ 62.)

The other portions of the specification cited by Express Mobile similarly support Defendants' construction and the requirement that the Application be interpreted or executed by the Player.  ('755 patent at 8:31-35 ("finished page that will be displayed on screen 137 when an Application can be intercepted, via a Player"); 34:51-64 ("Player . . . adapting the Application to the resources and limitations of any particular device"); 39:18-21 (dependent claim 21 confirming the Player "interprets" the Application, while providing further narrowing limitations that Player specifically interprets the Application's "values of the web component"); Schmandt Decl. ¶ 57.)  To be clear, nothing in these disclosures indicates something other than the claimed Player doing the necessary interpretation or execution of the Application.  (Schmandt Decl. ¶ 58.)  The Application is device-independent code that cannot be interpreted or executed without the Player, and Express Mobile has failed to cite any contrary intrinsic evidence.  (Schmandt Decl. ¶ 63.)

**B.**   **Player/player ('755 patent, '287 patent, '044 patent)**

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| software code that facilitates the execution of an application on a device | executable device-specific code that is separate from the Application/ application and that interprets or executes the |

| | Application/ application |
|---|---|

Defendants incorporate by reference the argument for the "Application" to support its construction that the Player (1) is separate from the Application and (2) interprets or executes the Application.  The parties' remaining disputes focus on (1) whether the Player is device-specific code; and (2) whether the Player is executable code.

### 1.    The Player is "device-specific code."

As described above, the central purpose of the alleged invention was to provide to specific devices Players that would be operable on those devices to employ the device-independent code in the Application, thereby allowing the Application to provide enhanced functionality without providing code specific to each device.  The specification correspondingly describes the Player as device-specific code, in contrast to the Application: "[D]evice- or device platform specific instructions for processor 135 of the device, **referred to herein and without limitation as a 'Player**,' and a device-independent program, referred herein and without limitation as an 'Application'." ('755 patent at 5:8-14; *see also id.* at Abstract ("Devices are provided with Players specific to each device and Applications that are device independent.").)  The patentee's characterization of the Player as device-specific code is repeated throughout the specification.  (*See, e.g.*, '755 patent at 5:49-55 ("A Player need be provided once or updated as necessary … the device-dependent programming is provided to a device only once (or possibly for some small number of upgrades)"); 23:43-45 ("a Player specific to device 130 of FIG. 4B."); 33:26-28 ("correct Player to a given device"); *see also* Schmandt Decl. ¶¶ 56, 79-80 (discussing how specification repeatedly describes the "player" as device-specific code).)

The applicants said the same thing during prosecution.  In the appeal brief that led to the '755 patent issuance, the applicants expressly stated that "a Player is device-dependent code."

The present patent application consistently use[s] the words 'Application' (with a capital A) and 'Player' (with a capital P) to refer to code that is provided to devices for accessing web services, where **an Application is device-[in]dependent code**[11] and **a Player is device-dependent code**."

---

[11] This quote has an obvious typographical error when referring to "Application" as "device-

(Exh. 8 at XMO_00002999-3000 n.2 (emphasis in original).)   The applicants explained that the advantage of the claimed invention was to have a device-specific Player on the one hand, and a device-independent Application on the other, to enable updates of only device-specific or device-independent code, without having to update the entire set of code at once.

> In one aspect of the present invention, the device-independent Application and **device-dependent Player** are both provided to a device, such as a smartphone. . . . If a new device comes on the market, or if it is found that the **device-dependent code for a specific device needs an update, a new Player is developed** and provided to those specific devices.  Likewise, if new capabilities are provided for certain web services, or if new web service is available, then a new Application is developed for those web services.

(*Id*. at XMO_00002998; *see also* Exh. 7 at XMO_00002938 ("The files include a Player (sometimes referred to herein as a "first code") specific to each device (that is, the code is "device-dependent") and an Application (sometimes referred to herein as a "second code") that is device independent.").)  Indeed, during prosecution, the applicants distinguished their claimed invention from the prior art on the ground that the claimed invention had a device-specific "player" and a device-independent "application."  (Exh. 44 at XMO_00002803 ("There is no teaching or suggestion in *McCain* of an authoring tool that provides two separate codes: a device-dependent code (such as the claimed Player) and device-independent code (such as the claimed Application).").)

Based on this evidence, the court in *Shopify* found that prosecution history disclaimer applies, and that the claimed Player is device-specific code.  Express Mobile's effort to avoid that conclusion is undercut by the prosecution evidence above, which it largely fails to even address.  (Exh. 8 at XMO_00002999-3000 n.2; *id*. at XMO_00002998; *see also* Exh. 7 at XMO_00002938; Exh. 4 at XMO_00002803.)  The *Shopify* court correctly noted that the applicants cited the device-specific Player (along with the Application) as "central to the invention" and "key innovations over the prior art of McCain."  *Shopify Inc. v. Express Mobile, Inc.*, No. CV 19-439-RGA, 2020 WL 3432531, at *6 (D. Del. June 23, 2020) (citing to *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136

dependent code," which should be device-independent code.  The error is clear from the other statements in the same filing.  (*See, e.g.*, Exh. 8 at XMO_00003002 ("the code is by necessity device-dependent, and is not equivalent to the claimed 'Application.'").)  Express Mobile agrees a similar typographical error was made in '755 patent claim 12.  (Joint Claim Constr. Statement, Exh. A ("where said Application is a device-[in]dependent code").)

(Fed. Cir. 2006)).  Regardless, as the *Shopify* court also found, even if the prosecution evidence does not rise to the level of disclaimer, the applicants' "repeated and consistent remarks" still inform the construction of "Player" to be "device specific."  *Id*. at 6 (citing *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020)).

Also, none of the specification passages that Express Mobile cites supports its argument that the "Player" could be device-independent code, like the Application.  Each citation supports Defendants' construction or is irrelevant.  (Schmandt Decl. ¶¶ 56, 72 (explaining each citation).)  For example, Express Mobile points to the specification reference to "no device specific dependencies," but a POSA would have recognized that this language describes the operating language, not the Player.[12]  ('755 patent at 1:55-67; Schmandt Decl. ¶ 70.)  Regardless, the Court in *Shopify* agreed that the "single reference to 'no device specific dependencies' is not enough to override the repeated references in the prosecution history and the specification to the 'device-specific' or 'device-dependent' Player."  *Shopify*, 2020 WL 3432531, at *6.

Although Express Mobile also argues that the claims of the '044 patent differ from the claims of the '755 and '287 patents, it never explains why such difference matters, or why any such difference supports construing Player as encompassing device-independent code.[13]  Specifically, Express Mobile argues that the '044 patent claims a Player that "utilizes information stored in [a] database to generate for the display of at least a portion of said one or more web pages," whereas the '755 and '287 claims do not recite a database requirement (Opening Br. at 12), but fails to explain how this would change the Player from being device-specific code.  Using a database does not change the Player from being device-specific, and there is no embodiment that suggests otherwise.

---

[12] Express Mobile also argues that the specification states the Player "may"—but not "must"—"include code that is device-specific."  This, however, does not suggest that a Player is not device-specific, particularly given the repeated references to the device-specific Player in the specification and prosecution history.

[13] Express Mobile points out that the claims of the '044 patent refer to player with a lowercase "p" and do not include explicit claim language specifying that the player is "a device-dependent player."  (Opening Br. at 8.)  But in prior litigation, Express Mobile's expert acknowledged he was not advocating for a different construction of Player based on capitalization, and the term was construed consistently across all three patents.  (*See* Exh. 19 at 189:20-190:3; Exh. 16 (setting forth the Court's construction of "Player / player" in the '755, '287, and '044 patents).)

(Schmandt Decl. ¶ 81.)  Moreover, Express Mobile proposes the same construction for "Player" and "Application" for all three patents despite various differences in the claims.

Express Mobile's effort to distinguish the '044 patent based on its prosecution history similarly fails. Its citation to a single page in the '044 patent prosecution history does not characterize the '044 claimed Player as different than the Player in the '755 or '287 patent claims.  And, while Express Mobile now suggests that the statements in the '755 prosecution history should not apply to the claims of the '044 patent, the applicants expressly relied on the '755 application during the prosecution of the '044 patent to support issuance.  (Exh. 9 at 9 ("The present application is a continuation application that claim priority to US Patent Application No. 12/936,395, which issued as US Patent No. 9,063,755.  Applicants respectfully submit that the present application is patentable for at least the reasons as those patents.  Applicants thus respectfully submit that the present application is in a condition for allowance").)  Statements in a parent application on common terms apply to child applications. *Teva Pharm. USA, Inc. v. Sandoz, Inc*., 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents.").  Further, during the '755 prosecution, the applicants asserted that the "present invention" (not just particular claims of that patent) has a "device-dependent Player." (Exh. 8 at XMO_00002998.)

## 2. The Player is "executable code."

This portion of Defendants' proposed construction is supported by the intrinsic evidence as well.  Express Mobile's contrary suggestion that the claimed Player could constitute some sort of non-executable data structure is unsupported.

First, the claim language states that the claimed Player is "executed on a device" and "provides instructions for the display of the device" after receiving output values.  ('755 patent, claims 1, 12; '287 patent claims 1, 15; '044 patent claims 1, 15.)  Accordingly, the claim language confirms that the Player is executable, as it is required to be executed to perform an action.

Second, the specification repeatedly and consistently discloses the "Player" as executable code, and never discloses a contrary embodiment.  Specifically, the Player code is executable, device-

specific instructions for the processor of the device to create the display.  ('755 patent at 5:10-12 (describing the Player "device- or device-platform specific instructions for processor 135 of the device").)  The Player provides executable code, including the instructions in the Application, to generate a display.  (*Id*. at 13:46–49 ("The intended programming is carried out on device 130 when the device, having the appropriate device platform Player, receives and **executes** the device-independent Application.").)  The specification never discloses an embodiment where the Player is not executable code because the processor of the device must utilize the Player—device-specific, executable instructions—to generate the display.  (*Id*. at 5:10-12, 5:57-59, Schmandt Decl. ¶¶ 89-90.)  Accordingly, Defendants' proposed construction is correct.  *See iLOR*, 550 F.3d at 1073–74; *Free Stream*, 996 F.3d at 1367; *Durel*, 256 F.3d at 1304.

Third, the prosecution history also establishes that the Player is executable code.  The applicants repeatedly identified the Player as such.  (Exh. 8 at XMO_00002998 ("the device receives an executable code in the form of a Player"); *id*. ("The execution of the Player on the device causes the Application to be interpreted").)  Further, the applicants distinguished device-specific code (i.e., the Player) as executable code, in contrast to the Application, which is non-executable code.  (Exh. 7 at XMO_00002934 ("device dependent (executable) and device independent (non-binary) elements"); Exh. 4 at XMO_00002803 ("*McCain* thus clearly teaches combining all code (executable, device dependent code) as well as parameters (device-independent code)"); *cf*. Exh. 7 at XMO_00002934 ("non-binary, device independent [code] contained in the Application").)

Indeed, the applicants overcame the prior art on this very basis, arguing that the prior art did not disclose a discrete Player having executable, device-specific code on the one hand, and non-executable, device-independent code of an Application on the other:

- Prior art solution in *McCain* "includes **all** necessary code to do so: both *non-binary components* (such as URLs including locations of other components) and *binary components* (such as graphics, audio, or video, executable components)."  (Exh. 4 at XMO_00002804.)

- "The present application teaches an authoring tool that generates an Application and a Player . . . wherein the **Player** (being device-dependent) is **executed** to interpret *non-binary*, device independent [code] in the *Application*."  (Exh. 7 at XMO_00002934.)

- "There is no teaching or suggestion in *McCain* of an authoring tool that provides two separate codes: a device-dependent code (such as the claimed Player) and the device-independent code (such as the claimed Application)."  (Exh. 4 at XMO_00002804.)

Because the applicants argued that a Player being executable code overcomes the prior art, the claimed "Player" must be executable code.  *See, e.g.*, *iLOR*, 550 F.3d at 1073–74 (affirming construction of "toolbar being displayable" as "the toolbar is 'automatically displayed'" because applicants distinguished prior art during prosecution on the basis that the prior art required user action to display the toolbar); *Fenner Inv., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1325–26 (Fed. Cir. 2015) ("[T]he interested public has the right to rely on the inventor's statements made during prosecution").

Express Mobile's attempt to use its expert declaration to argue that a Player is not necessarily executable must fail, as extrinsic evidence cannot contradict the unambiguous statements in the intrinsic record.  *E.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (extrinsic evidence cannot "contradict claim meaning that is unambiguous in light of the intrinsic evidence").  Express Mobile fails to provide any intrinsic evidence to support its position, and instead relies on its expert declaration and a citation to *Shopify* that do not, and cannot, contradict the intrinsic record.  First, in *Shopify*, the parties and the court addressed a proposed construction, not at issue here, of "an executable file," where Express Mobile argued in part that a Player need not be a single file.  Second, as a practical matter, the entire discussion as to "executable" in *Shopify* was peripheral to the primary disputes, as the parties devoted less than 1 out of 89 pages of claim construction briefing to the issue of "an executable file."  (Exh. 31 at 73-74.)  Claim construction briefing in that case was dominated by claim terms in U.S. Patent Nos. 6,546,397 and 7,594,168, neither of which is at issue here.  And, that minimal briefing did not address the intrinsic record laid out above that consistently shows the Player is executable code, or explain that the intrinsic record discloses no embodiment of the Player or any characterization of the Player as non-executable code.  In short, Defendants respectfully suggest that on this issue, the *Shopify* Court did not consider the full intrinsic record, which establishes that the "Player" is executable code.

Express Mobile's expert's related effort to re-interpret the specification statement that the Player can "adapt the Application to the resources and limitations of any particular device" ('755

1  patent at 34:51-64) fails to show the Player is non-executable code.  (Schmandt Decl. ¶ 89.)  To the

2  contrary, this shows the Player is device-specific code that must execute instructions for adapting the

3  Application to a specific device.  ('755 patent at 34:51-64 ("adapt the Application" for the "particular

4  device"); Schmandt Decl. ¶ 54 (explaining Player is executing for the adapting tasks).)   Express

5  Mobile's argument that a Player can "extend the operating software" is similarly unavailing as even

6  its expert fails to explain why this statement is at all relevant.  (Schmandt Decl. ¶ 65 (explaining not

7  relevant).)

8      **C.**    **device-dependent code / device dependent code ('755 patent, '287 patent)**

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| code that is specific to the operating system, programming language, or platform of a device | code for a specific device |

12       Defendants' proposed construction is based on the specification, which repeatedly

13  characterizes device-dependent code (in the form of a Player), as code for a specific device.  For

14  example, the specification discloses that different devices "may be operable using different sets of

15  instructions," and "[i]n some embodiments, devices 130 are provided with some **programming** from

16  authoring system 100 that is **particular to the device**."  ('755 patent at 4:66-5:7.)  A user of the

17  authoring system can provide instructions to each of a plurality of devices in the form of "device- or

18  device-platform specific instructions," which are referred to as a "Player," and also a separate device-

19  independent program, referred to as an "Application."  (*Id.* at 5:8-15.)  This differentiation allows

20  "code that is device specific" to be "maintained separately from code that [is] web service specific."

21  (Exh. 8 at XMO_00002998.)  "If a new device comes on the market, . . . a new Player is developed

22  and provided to those specific devices."  (*Id.*)

23       The specification repeatedly and consistently equates "device-dependent" code with code for

24  a specific device.  (*E.g.*, '755 patent at Abstract (stating that Players (*i.e.*, device-dependent code) are

25  "specific to each device"), 3:58-62 (referring to "device-specific routines—that is, codes that are

26  specific to the operating system, programming language, or platform of specific devices"), 5:10-11

27  ("device- or device-platform specific instructions"), 5:43-44 ("a plurality of Players (for different

28

1   devices 130)").)

2        Express Mobile suggests without merit that because the Player may "adapt[] the Application

3   to the resources and limitations of any particular device" (Opening Br. at 13), the specification

4   supports its proposed construction.  This portion of the specification refers to "particular device[s]"

5   and explains how a Player may account for device-specific requirements, consistent with Defendants'

6   proposed construction.  ('755 patent at 34:51-64.)

7        During prosecution, Express Mobile likewise equated "device-dependent code" with code

8   "specific to each device." When arguing for the allowance of its claims, Express Mobile again told

9   the Patent Office that "device-dependent" code refers to code operable "on a specific device." (Exh.

10  7 at XMO_00002938.)  Express Mobile repeated this characterization in its appeal to the Patent Trial

11  and Appeal Board, equating "device-dependent" with "specific to each device": "a

12  <u>Player</u> . . . specific to each device (that is, the code is 'device-dependent') …." (Exh. 8 at

13  XMO_00002998, XMO_00003002 ("[S]ince the code is generated to run on a specific device, …

14  McCain is teaching the generation of a Player." (original emphasis omitted)).)

15       Defendants' construction of "device-dependent" code also tracks the conventional meaning

16  of that term as demonstrated by reliable extrinsic evidence.  *See Pitney Bowes, Inc. v. Hewlett-*

17  *Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) ("[I]t is entirely appropriate, perhaps even

18  preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction

19  ... is not inconsistent with clearly expressed, plainly apposite and widely held understandings in the

20  pertinent technical field."). The IBM Dictionary Computing (1994) defines "device-dependent" as

21  "[p]ertaining to a program that can be executed successfully only if particular types of devices are

22  available."  (Exh. 14 at DEFSEXTRINSIC_XMO_00000053.)  That definition contrasts with the

23  definition for "device-independent," which means "[p]ertaining to a program that can be executed

24  successfully without regard for the characteristics of particular types of devices." (*Id.*)  As another

25  example, the Microsoft Press Computer Dictionary defines "device dependence" as the "requirement

26  that a particular device be present or available for the use of a program," unlike "device

27  independence," which means a program "that produce[s] similar results on a wide variety of

28

1  hardware."   (Exh.  13  at  DEFSEXTRINSIC_XMO_00000057;  *see  also*  Exh.  12  at

2  DEFSEXTRINSIC_XMO_00000060 (same).)

3  Express Mobile urges this Court to accept its construction because it was adopted in *Shopify*

4  *Inc. v. Express Mobile, Inc.*, Civ. No. 19-439-RGA.  (*See* Exh. 25.)[14]  Yet in *Shopify*, neither party

5  proposed this construction, but the Court adopted it because "[t]he specification at one point defines

6  'device-*specific*' routines as 'codes that are specific to the operating system, programming language

7  or platform of *specific* devices."  (*Id.* at 15 (quoting '755 patent at 3:58-62).)  The problem with the

8  *Shopify* Court's construction, however, and Express Mobile's proposed construction here, is that it

9  omits the second "specific," which confirms that "device-dependent code" is for specific devices.

10  Moreover, the specification portion relied on by Express Mobile ('755 patent at 3:58-62) rests on an

11  important, stated caveat: after listing some examples of device-specific code, the '755 patent states

12  "[i]t is understood that the invention is not so limited, except as provided in the claims …."  ('755

13  patent at 3:64-65.)  The day the '755 patent was filed, Express Mobile filed a preliminary amendment

14  to refocus the claims from a "platform" to a "device": "produce <u>device-specific</u> code that, when

15  executed on the ~~platform~~ <u>device</u>, provides said selected component on the display of the ~~platform~~

16  <u>device</u>." (Exh. 2 at XMO_00001786.)  Express Mobile explained that this was done "to more clearly

17  recite the subject matter of the invention" because "the code runs on a device, which may form part

18  of a platform."  (*Id.*)  Throughout the subsequent prosecution, Express Mobile maintained that

19  "device-specific" or "device-dependent" requirement, and never returned to a platform-dependent

20  requirement.[15]  Because the claims were amended to require device-specific code, not platform-

21  specific code, operating system-specific code, or programming language-specific code, the

22  specification cannot overcome the consistent and repeated statements during prosecution by Express

23

24  _____

[14] Express Mobile misleadingly points to the *GoDaddy* case as having also decided this issue (Opening Br. at 12), but there the parties *agreed* to Express Mobile's construction. (Exh. 15 at DEFSEXTRINSIC_XMO_00000383.)

25  [15] For context, it appears that Express Mobile's proposed construction is based on Express Mobile's desire to twist the meaning of "platform" to encompass any code that varies at all based on device

26  characteristics.  For example, Express Mobile refers to "conditional branching," which refers to code that is sent to all devices, but only certain portions of it are run, depending on, for example, the version

27  of the browser used on the device.  Nothing in the specification or intrinsic record suggests that this is a type of "device-dependent" code contemplated by the patentee, despite the fact that such code

28  had long been known in the art.  (Schmandt Decl. ¶¶ 91-93; Exh. 20.)

Mobile that explained that "device-dependent code" meant code "for a specific device."

### D.    device-independent code / device independent code ('755 patent, '287 patent)

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary; *Alternative*: code that is not specific to the operating system, programming language, or platform of a device | code that is not for a specific device |

The plain and ordinary meaning of "device-independent code" is simply the inverse of "device-dependent code": code that is **not** for a specific device. As explained above, the specification and Express Mobile's consistent representations to the Patent Office support interpreting "device-**dependent** code" as "code that **is** for a specific device," and likewise support interpreting device-**independent** code" as "code that **is not** for a specific device."

### E.    web component ('755 patent, '287 patent, '044 patent)

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| one or more functionalities associated with one or more web page elements to be displayed on a device | software object that provides functionalities of a web service |

The parties agree that web components relate to "functionalities," but dispute whether those components provide the functionalities of web services (Defendants' proposed construction) or are associated with one or more web page elements to be displayed on a device (Express Mobile's construction).  Defendants' proposed construction, to which Express Mobile agreed and which the *GoDaddy* court adopted,[16] is consistent with the claims, specification, and prosecution history. (*See* Schmandt Decl. ¶¶ 91-93.)

The specification describes that web components are the software objects that provide functionalities associated with a web service.  (*See* '755 patent at 2:33-34, 8:18-26, 8:36-47, 8:58-63, 22:15-17, 22:40-43, 25:6-15, Figs. 3E, 3F; Schmandt Decl. ¶¶ 101-103; *see also* Opening Br. Exh. 1, Weadock Decl. ¶ 43 (agreeing that "[w]eb components comprise functionalities associated with, for example, web services").)  Specifically, the specification explains that "components" of web services

---

[16] Exh. 15 at DEFSEXTRINSIC_XMO_00000387.

are registered in a "web component registry" that may be used by a user of the authoring platform to "bind web services 230 to elements to be displayed on the device 130." ('755 patent at 8:18–26; *see also id.* at 8:36-47.) The specification provides the following example: third-party web service Yahoo Maps may be placed "into device 130 by binding the required component of the Yahoo Maps Web Service, such as Yahoo Map's Inputs and/or Outputs to appropriate Objects of authoring platform 110." ('755 patent at 10:4-9.) The "web components" are the software objects that provide the "inputs and outputs" functionality for the Yahoo Maps Web Service. Thus, the specification teaches that web components are the software objects that provide functionalities of a web service, which *may* be associated with UI objects on a screen providing access to those services.

The file history, which includes the priority documents further describing web components, provides additional support for Defendants' proposed construction. For example, one of these documents describes an Appendix of "Web Component Models." (Exh. 1 at XMO_00002265.) These exemplary models are XML-formatted documents that define inputs and outputs for various web services. (*Id.* at XMO_00002266-2279.) They specify how the web components provide the functionality of the web services to the user of the device.

Moreover, a technical glossary that is part of the prosecution history provides further clarity and support. Specifically, Express Mobile relied on the W3C glossary definitions to explain its purported invention. (*See* Exh. 5 at XMO_00002852-2853; Exh. 6 at XMO_00002876-2877; Schmandt Decl. ¶¶ 98-99.) The W3C glossary defines "component" as follows:

> **A component is a software object**, meant to interact with other components, **encapsulating certain functionality or a set of functionalities**. A component has a clearly defined interface and conforms to a prescribed behavior common to all components within an architecture.

(Exh. 22 at 4.) Defendants' construction properly accounts for and reflects this established meaning for "component" as a software object providing functionality, as would have been understood by a POSA. (Schmandt Decl. ¶¶ 98-99.)

In contrast, Express Mobile's proposed construction defines web component as merely "*functionalit[y]* associated with one or more *web page elements*." This proposal is untethered to the

claimed invention, inconsistent with the W3C glossary and how a POSA would have understood the term, overly broad, and unhelpful to understanding the term.  (Schmandt Decl. ¶¶ 103-105.)

First, Express Mobile's construction seeks to replace "web services" with "web page elements," which is not supported by the specification or the claims.  Indeed, the two are not the same; an element of a web page could be a static piece of text or a jpeg displayed on a web page, whereas a web service is a software system designed to support interoperable machine-to-machine interaction over a network.  (Schmandt Decl. ¶¶ 106-107; '755 patent at 1:33-36, 8:18-19.)  Information from a web service *can* be bound to and displayed using elements and UI objects as described in the specification.  (*See* '755 patent at 8:24-26.)  But such "elements and UI objects" are not necessarily "*web page* elements"—indeed, the specification distinguishes "web pages" from "Application pages."  (*Id.* at 12:4-10.)  And functions of such "elements and UI objects" are not necessarily provided by web components or web services.  (*Id.* at 6:31-47.)  By treating web component as functionality of anything that is displayed as part of a web page, Express Mobile impermissibly broadens this term to cover any navigation or display effect on a web page.  (Schmandt Decl. ¶¶ 106-107.)

Second, the intrinsic evidence Express Mobile cites does not support its construction.  The cited passages describe how the author of an Application *can* bind web components defining web services to UI objects ('755 patent at 2:33–34, Fig. 3E and 3F, 22:15-17, 22:40–43) using the registry of available web components (*id.* at 8:22–26), but Express Mobile's construction mandates that web components defining web services are bound to UI objects.

Third, Express Mobile's construction conflicts with the understanding of a POSA in light of the specification disclosures and technical glossary described above.  (Schmandt Decl. ¶¶ 106-107.)

Fourth, the addition of "associated with one or more web page elements to be displayed on a device" in Express Mobile's construction—other than improperly conflating a web service with a web page or other application display—is superfluous, as the claim language discloses how the web components are associated with UI objects (i.e., elements to be displayed on a device).  (*See, e.g.*,

1   '755 patent at claim 1 ("associate the selected symbolic name with the defined UI object"); *id.* at

2   claim 12 (similar); '287 patent at claims 1 and 15 (similar); '044 patent at claims 1 and 15 (similar).)

3   Express Mobile fails to meaningfully challenge the construction that Defendants propose and

4   that it agreed should apply in *GoDaddy*.  Express Mobile argues—without explanation—that

5   Defendants' proposal is "imprecise," but Express Mobile fails to explain why.  Moreover, Express

6   Mobile's proposed construction introduces unnecessary ambiguity into the claims through the

7   proposed "associated with" language, which Express Mobile asserts means "intertwined."  (Opening

8   Br. at 14.)  That Express Mobile's proposed construction itself requires construction further confirms

9   how Express Mobile's construction would ultimately be confusing and unhelpful to a jury.  Express

10  Mobile also argues that because a web component may have "subordinate output UI objects,"

11  Defendants' construction improperly limits a web component to one "software object."  (Opening Br.

12  at 14.)  Not so.  "Subordinate output *UI objects*" refer to just that:  UI objects, not the software object

13  that comprises the web component.

14          **F.    Each symbolic name has an associated data format class type corresponding to
                     a subclass of User Interface (UI) objects that support the data format of the
15                   symbolic name[17] ('287 patent, '044 patent)[18]**

16          This claim limitation, which appears in the asserted claims of both the '287 and '044 patents,

17  is indefinite for two independent reasons.

18          First, the limitation refers to a "data format class type," but that term is not found in the

19  specification, the file history, or otherwise mentioned at all.  Both "data type" and "data format" are

20  used, but there is no explanation of how those terms relate to "data format class type," "class type"

21  or "classes" at all, so a POSA would have been unable to discern what the inventor was claiming

22  when referring to "data format class type."  (Schmandt Decl. ¶¶ 109, 113.)[19]  Thus, the patentee

---

23

24  [17] The SAP and Adobe defendants do not join this construction.

25  [18] To reduce the issues necessary for the Court to decide, Defendants agree that the plain and ordinary
    meaning of the terms "computer memory storing a registry of symbolic names / computer memory
26  storing symbolic names" and "said player utilizes information stored in said database to generate for
    the display of at least a portion of said one or more web pages" should apply in these cases.

27  [19] Express Mobile's reliance on Mr. Schmandt's reports from the *Shopify* litigation are misplaced.  In
    his reply report relating to invalidity, Mr. Schmandt noted that "Dr. Almeroth provides one potential
28  explanation for what the claim language means," but also opined that "it is not the only one, and the

"fail[ed] to inform with reasonable certainty those skilled in the art about the scope of the invention," and the asserted claims are invalid. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Express Mobile's position that "data format class type" means "data type"[20] would eliminate two of the four words from the term, finds no support in the intrinsic record, and contravenes longstanding Federal Circuit precedent cautioning against reading words out of the claim. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582 (Fed. Cir. 1996) (rejecting a claim construction that would read out claim language and recognizing that that the court must "give meaning to all the words in [the] claims.") (citation omitted). Significantly, after prevailing on summary judgment of no indefiniteness in the *Shopify* case,[21] Express Mobile backtracked on its assertion that data format class type means "data type," and instead proposed that the term means "data type associated with a class of UI objects," not just a "data type." (Exh. 26 at 1.) Despite this new construction in the *Shopify* case, Express Mobile simultaneously argues that the term should mean "data type" in this case. Express Mobile's inconsistent positions regarding how a POSA would have understood "data format class type" confirms that this claim limitation is indefinite.[22]

Second, the term "subclass of User Interface (UI) objects" also renders this claim limitation indefinite. The specification of the asserted patent offers no guidance on how to determine a "class of UI objects," let alone what is sufficient to constitute a "subclass" of these objects. (Schmandt Decl. ¶¶ 115-116.) Express Mobile argues that a POSA would have looked to Table 1 of the '287 patent and understood that a "subclass" corresponds to a "subset" of UI objects available for a given data

---

specification provides no guidance on how to determine which explanation governs." (Opening Br. Exh. 19, Schmandt Reply Rpt. ¶ 1433.) And in Mr. Schmandt's opening report on invalidity, he reiterated his opinion that the term "subclass of user interface (UI) objects" rendered the asserted claims indefinite, but even under Express Mobile's interpretation, the asserted claims are invalid in light of the prior art. (*See, e.g.*, Exh. 23 ¶ 1054 (noting that he was applying Express Mobile's construction).) Express Mobile fails to attach or address this portion of Mr. Schmandt's report.

[20] Exh. 28 at 23; *see also* Exh. 29 ¶¶ 1142–1147.

[21] Defendants respectfully disagree with the Court's decision in *Shopify*, which appears to have been premised, at least in part, on the fact that the term "data format class type" was not identified for construction. (Exh. 30 at 54.)

[22] Express Mobile's new interpretation of "data format class type," recently proffered in the *Shopify* case, makes no sense because the claim would then read "data type associated with a class of UI objects corresponding to a subclass of User Interface (UI) objects." (*See* Exh. 34.) Jurors would be confused about how and why a data type can both be associated with a class of UI objects, but also correspond to a subclass of UI objects as the claim explicitly requires. (*Id.*)

type.  (Opening Br. at 17 and Exh. 1, Weadock ¶¶ 46-47.)  But Express Mobile is again rewriting the claim language and, in doing so, skips over the fact that before identifying a "subclass," the POSA would necessarily need to identify the "class" from which it is derived.  Express Mobile offers no explanation of how a POSA would segregate all available UI Objects into different classes and, therefore, a POSA would not be certain whether a given subset of UI objects is in fact a subclass.  Indeed, if Express Mobile's argument were accepted, there would be no need for the claims to refer to a "subclass of User Interface (UI) objects" at all and could instead, have simply been drafted to require a "data format class type corresponding to User Interface (UI) Objects."  While Express Mobile may now regret drafting the claims to include the specific concept of a "subclass" of UI objects, that is no reason to rewrite the claims as Express Mobile suggests.  As drafted, the scope of this limitation would be uncertain to a POSA, which renders the claims in which it appears indefinite.

### G.    preferred UI object ('287 patent, '044 patent)

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a UI object associated with a data type that is favored | a UI object associated with a data type that is favored over the other UI object candidates for that data type |

In three prior litigations, Express Mobile previously agreed to the construction of a "preferred UI object" as "a UI object associated with a data type that is favored **over the other UI object candidates for that data type**." (Exh. 31 at 3; Exh. 16 at 3; Exh. 32 at 1; Exh. 33 at 2.)  Yet here, for the first time, Express Mobile offers a different, and broader, construction for this term that eliminates the requirement that the associated data type is favored "**over the other UI object candidates for that data type.**"  Express Mobile offers no basis for departing from the Court's previous construction of this limitation, which it expressly agreed to.  Express Mobile's new construction appears designed to encompass systems in which only one UI object is available for selection (as opposed to systems that have multiple UI objects, from which one "preferred" object is selected).  Express Mobile's construction is inconsistent with the ordinary meaning of what it means for something to be "preferred," (i.e. "to choose one thing rather than something else because you like it better").  (*See* Exh.           24,           Oxford           Learner's           Dictionaries           at

1   https://www.oxfordlearnersdictionaries.com/definition/english/prefer#:~:text=to%20like%20one%2

2   0thing%20or%20person%20better%20than,anyone.%20A%20local%20firm%20is%20to%20be%2

3   0preferred.)

4         Further, Express Mobile's construction is inconsistent with the patent specification, which

5   makes clear that UI objects are associated with certain data types and there are preferred input and

6   output objects for each data type.  (*See* '287 Patent at Table I; 14:34-67, 17:23-31.) For example, the

7   specification describes that possible UI objects include text fields, objects, lists, check boxes, URLs,

8   and buttons among others.  (*See id.*)  Given that there are many potential UI objects for the authoring

9   tool to select from, a "preferred UI object" is selected from UI object candidates and is therefore

10  "favored over the other UI object candidates for that data type."  The Court should deny Express

11  Mobile's attempt to now offer a new construction that departs from Express Mobile's previously

12  agreed-to construction, the specification, and the ordinary meaning of this limitation.

13        The only purported support Express Mobile offers for its proposed construction is Table I of

14  the specification, which lists various data types and associated input and outputs.  However, Table I

15  does not include the claimed "preferred UI object."  While Table I has two column headings that refer

16  to "preferred" inputs/outputs for which there is only one candidate, these headers do not refer to "a

17  preferred UI object."  The claimed "preferred UI object" is specified in the claims to be a UI object

18  selected from a subclass of User Interface (UI) objects, either by the user or automatically.  Thus, the

19  preferred inputs/outputs for which there is only one candidate in Table I are not the claimed "preferred

20  UI object."

21        The fact that the claim refers to a preferred UI object (singular) from a "subclass of UI objects"

22  (plural) confirms that a POSA would not have understood "preferred UI object" to encompass a

23  scenario where only one object is available for selection.  Thus, the preferred inputs/outputs for which

24  there is only one candidate in Table I are not the claimed "preferred UI object."  Indeed, it would

25  make no sense to refer to anything as a preferred option if that is the only option available.  Nor does

26  Express Mobile's solution to simply excise the phrase "over the other UI object candidates for that

27  data type" make sense, since it would undoubtedly cause jurors to wonder "favored over what?"

28

1    Accordingly, consistent with the plain and ordinary meaning of the word preferred, as well as

2    the prior agreed-upon construction of this term, Defendants' proposed construction should be

3    adopted.

4

5    DATED: November 12, 2021                         Respectfully submitted,

6                                                      /s/ *Ryan J. Casamiquela*
                                                      Michael A. Berta (SBN 194650)
7                                                      Ryan J. Casamiquela (SBN 228559)
                                                      **ARNOLD & PORTER KAYE SCHOLER LLP**
8                                                      Three Embarcadero Center, 10th Floor
                                                      San Francisco, CA  94111
9                                                      Telephone:    (415) 471-3100
                                                      Facsimile:    (415) 471-3400
10                                                     michael.berta@arnoldporter.com
                                                      ryan.casamiquela@arnoldporter.com
11

12                                                     Nicholas Lee (SBN 259588)
                                                      **ARNOLD & PORTER KAYE SCHOLER LLP**
13                                                     777 S Figueroa Street, 44th Floor
                                                      Los Angeles, CA  90017-5844
14                                                     Telephone:    (213) 243-4000
                                                      Facsimile:    (213) 243-4199
15                                                     nicholas.lee@arnoldporter.com

16                                                     *Attorneys for Defendants Adobe Inc. &*
                                                      *X.Commerce Inc. d/b/a Magento Inc.*
17

18                                                     /s/ *Irene Yang*
19                                                     Michael J. Bettinger (SBN 122196)
                                                      mbettinger@sidley.com
20                                                     Irene Yang (SBN 245464)
                                                      irene.yang@sidley.com
21                                                     Sue Wang (SBN 286247)
                                                      sue.wang@sidley.com
22                                                     Saurabh Prabhakar (SBN 300891)
                                                      sprabhakar@sidley.com
23                                                     **SIDLEY AUSTIN LLP**
24                                                     555 California Street, Suite 2000
                                                      San Francisco, CA 94104-1715
25                                                     Telephone:    (415) 772-1200
                                                      Facsimile:    (415) 772-7400
26

27                                                     Richard A. Cederoth (*pro hac vice*)
                                                      rcederoth@sidley.com
                                                      **SIDLEY AUSTIN LLP**
28                                                     One South Dearborn

Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036

*Attorneys for Defendants Microsoft Corporation,*
*LinkedIn Corporation, Dropbox, Inc., Adobe Inc.,*
*and X.Commerce Inc. d/b/a Magento Inc.*


/s/ *Adam R. Brausa*
Timothy C. Saulsbury (SBN 281434)
tsaulsbury@durietangri.com
Adam R. Brausa (SBN 298754)
abrausa@durietangri.com
Vera Ranieri (SBN 271594)
vranieri@durietangri.com
Raghav R. Krishnapriyan (SBN 273411)
rkrishnapriyan@durietangri.com
Eric C. Wiener (SBN 325012)
ewiener@durietangri.com
**DURIE TANGRI LLP**
217 Leidesdorff Street
San Francisco, CA 94111
Telephone:    (415)-362-6666
Facsimile:    (415)-236-6300

*Attorneys for Defendants Wix.com, Ltd.*
*Wix.com, Inc. and Pinterest, Inc.*


/s/ *Jeremy Taylor*
Peter H. Kang (SBN 158101)
peter.kang@bakerbotts.com
Jeremy J. Taylor (SBN 249075)
jeremy.taylor@bakerbotts.com
Katherine A. Burgess (SBN 330480)
katherine.burgess@bakerbotts.com
**BAKER BOTTS L.L.P.**
101 California Street, Suite 3600
San Francisco, CA 94111
Telephone:    (415) 291-6200
Facsimile:    (415) 291-6300

*Attorneys for Defendants, BOOKING.COM B.V.,*
*PRICELINE.COM LLC, AGODA COMPANY*
*PTE. LTD., and OPENTABLE, INC.*


/s/ *Ross Barton*
Michael J. Newton (SBN 156225)
Katherine G. Rubschlager (SBN 328100)

mike.newton@alston.com
katherine.rubschlager@alston.com
**ALSTON & BIRD LLP**
1950 University Avenue, Suite 430
East Palo Alto, CA 94303
Telephone:      (650) 838-2999
Facsimile:      (650) 838-2100

Ross R. Barton (admitted *pro hac vice*)
ross.barton@alston.com
**ALSTON & BIRD LLP**
101 South Tryon Street
Bank of America Plaza, Suite 4000
Charlotte, NC 28280
Telephone:      (704) 444-1000
Facsimile:      (704) 444-1111

*Attorneys for Defendant Oath Holdings, Inc.*


/s/ *James Batchelder*
James R. Batchelder (CSB # 136347)
James L. Davis, Jr. (CSB # 304830)
**ROPES & GRAY LLP**
1900 University Ave. 6th Floor
East Palo Alto, CA 94303-2284
Telephone:      (650) 617-4000
Facsimile:      (650) 617-4090
James.Batchelder@ropesgray.com
James.L.Davis@ropesgray.com

Lance W. Shapiro (*pro hac vice*)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY  10036-8704
Telephone:      (212) 596-9000
Facsimile:      (212) 596-9090
Lance.Shapiro@ropesgray.com

*Attorneys for Defendants SAP SE; SAP America,*
*Inc.; and SAP Labs, LLC*

1
                                    /s/ *J. David Hadden*
2                                   J. David Hadden (SBN 176148)
                                    dhadden@fenwick.com
3                                   Saina S. Shamilov (SBN 215636)
                                    sshamilov@fenwick.com
4                                   Rebecca A.E. Fewkes (SBN 209168)
                                    rfewkes@fenwick.com
5                                   **FENWICK & WEST LLP**
                                    801 California Street
6                                   Mountain View, CA  94041
                                    Telephone:     (650) 988-8500
7                                   Facsimile:      (650) 938-5200

8                                   Todd R. Gregorian (SBN 236096)
                                    tgregorian@fenwick.com
9                                   Jessica L. Benzler (SBN 306164)
                                    jbenzler@fenwick.com
10                                  M. Conner Hutchisson (SBN 327872)
                                    chutchisson@fenwick.com
11                                  **FENWICK & WEST LLP**
                                    555 California Street, 12th Floor
12                                  San Francisco, CA  94104
                                    Telephone:     (415) 875-2300
13                                  Facsimile:      (415) 281-1350

14
                                    Albert J. Rugo (SBN 306134)
15                                  arugo@fenwick.com
                                    **FENWICK & WEST LLP**
16                                  1191 Second Avenue, 10th Floor
                                    Seattle, WA  98101
17                                  Telephone: 206.913.4309
                                    Facsimile: 206.389.4511
18

19                                  *Attorneys for Defendants Slack Technologies, Inc.,*
                                    *Amazon.Com, Inc., Salesforce.Com, Inc.*
20

21

22

23

24

25

26

27

28

1

**FILER'S ATTESTATION**

2          Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has

3   been obtained from each of the other signatories shown above and that all signatories have authorized

4   placement of their electronic signature on this document.

5

6                                          By: */s/ J. David Hadden*
                                              J. David Hadden

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28